NICOLA T. HANNA
United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
STEVEN R. WELK
Assistant United States Attorney
Chief, Asset Forfeiture Section
VICTOR A. RODGERS
California Bar No. 101281
Assistant United States Attorney
Asset Forfeiture Section
    Federal Courthouse, 14th Floor
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-2569
    Facsimile: (213) 894-0142
    E-mail: Victor.Rodgers@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| UNITED STATES OF AMERICA, | ) | Case No. 8:20-CV-01989 |
|---|---|---|
| Plaintiff, | ) | COMPLAINT FOR FORFEITURE |
| v. | ) | 18 U.S.C. §§ 981(a)(1)(A) and (C) and 984 |
| $176,548.00 IN U.S. CURRENCY, | ) | [FBI] |
| Defendant. | ) | |

        Plaintiff United States of America brings this claim against defendant $176,548.00 In U.S. Currency (the "defendant currency"), and alleges as follows:

JURISDICTION AND VENUE

        1.    The government brings this in rem forfeiture action pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C) and 984.

2. This Court has jurisdiction over the matter under 28 U.S.C. §§ 1345 and 1355.

3. Venue lies in this district pursuant to 28 U.S.C. § 1395.

## PERSONS AND ENTITIES

4. The plaintiff in this action is the United States of America.

5. The defendant in this action is $176,548.00 In U.S. Currency (the "defendant currency") seized on or about July 26, 2019, during the execution of a federal search warrant at Tarek Greiss' Costa Mesa, California residence.

6. The defendant currency is currently in the custody of the United States Marshals Service in this District, where it will remain subject to this Court's jurisdiction during the pendency of this action.

7. The interests of Greiss may be adversely affected by these proceedings.

## BASIS FOR FORFEITURE

Background Of The Investigation

8. The Federal Bureau of Investigation has conducted an investigation into the activities of Greiss in connection with Greiss' operations of South Coast Counseling, Inc. and Elite Care, Inc., which are substance abuse treatment facilities located in Costa Mesa, California. As a result of the investigation, law enforcement officers determined that Greiss was paying kickbacks and bribes in exchange for the referral of patients to these facilities, and was also receiving kickbacks and bribes for referring patients to clinical laboratories for

1  the performance of laboratory tests.  The investigation has led
2  to the September 16, 2020 filing of an indictment against Greiss
3  in the Central District of California.  See United States v.
4  Tarek Greiss, Case No. 8:20-cr-00131-MWF.

5  Overview Of Substance Abuse Treatment Facility Fraud

6       9.   Substance abuse treatment facilities provide services
7  to patients seeking treatment for drug and alcohol addiction.
8  As to those patients admitted to substance abuse treatment
9  facilities who have insurance, the facilities will submit claims
10 to insurance companies requesting payment for the services the
11 facilities have performed.  If the insurance companies accept
12 the claim, the insurance companies will pay substance abuse
13 treatment facilities for that portion of the claim covered by
14 insurance.  The amount of the claim that is covered and for
15 which payment is made depends upon a variety of factors,
16 including the type of service the substance abuse treatment
17 facility provides to the patient, the addiction for which the
18 patient is treated, and the length of time the patient remains
19 at the facility.

20      10.  In light of the potential lucrative revenues derived
21 from treating patients covered by insurance, some substance
22 abuse treatment facilities engage in fraud schemes designed to
23 illegally capture these revenues.  One scheme involves substance
24 abuse treatment facilities operators paying kickbacks and
25 engaging in patient brokering to do so, which involves using
26 patient recruiters (also referred to as patient brokers and
27 patient marketers).  The practice of patient brokering consists
28 of utilizing patient brokers, in exchange for payment of illegal

3

kickbacks and bribes to the patient brokers, to locate, recruit and ultimately refer patients to substance abuse treatment facilities for treatment.

11.   The benefits received by substance abuse treatment facilities as a result of rendering services to patients referred via kickbacks and bribes can be substantial.   For example, a single patient enrolled in a substance abuse treatment facility for opiate addiction can result in a substance abuse treatment facility receiving insurance payments of more than $3,000.00 per day and $90,000.00 in total depending upon the length of the patient's stay.   By contrast, legitimate substance abuse treatment facilities, which refuse to pay patient brokers for referring patients, are often forced to discontinue operations due to a lack of patients.

12.   As part of their recruitment pitch, patient brokers receiving kickbacks recruit patients by, among other things, making promises to pay potential patients sums ranging between a few hundred to a few thousand dollars, with the ultimate payment amount depending upon the patient's projected length of stay and the anticipated value of the patient's insurance benefits.   With respect to the value of the patient's insurance benefits, insurance companies pay substance abuse treatment facilities the highest amounts for patients that receive treatment for Detox. Treatment for Detox consists of providing specialized medical care to patients whose dependence on drugs is so severe that the abrupt discontinuation of or decrease in those patients' drug use could lead to dangerous withdrawal symptoms.

4

1    13.   Typically, patients must test positive for drug use
2    before insurance companies will pay substance abuse treatment
3    facilities for Detox treatment.  In light of this fact, patient
4    brokers will give prospective patents drugs in order to make
5    sure that the patient tests positive for drugs and thereby
6    becomes eligible for Detox treatment at the substance abuse
7    treatment facility.

8    14.   Substance abuse treatment facilities and patient
9    brokers know that it is illegal to pay patient brokers on a per-
10   patient basis for each patient the broker refers to a facility.
11   Indeed, substance abuse treatment facility operators often
12   overhear patients talking about receiving money from patient
13   brokers, or discover that patient brokers have provided drugs to
14   potential patients in order to ensure they test positive for
15   drugs and are admitted to the substance abuse treatment facility
16   for treatment.

17   15.   In an attempt to conceal the kickback, per-patient
18   fraud scheme and the reason for the unlawful payments, substance
19   abuse treatment facilities and patient brokers use various
20   devices to hide their activity.  For example, substance abuse
21   treatment facilities will pay the kickbacks in cash to avoid
22   leaving a paper trail that might unearth the details of the
23   kickback transactions.  In addition, substance abuse treatment
24   facilities and patient brokers will enter into sham contracts
25   and create phony invoices that falsely state that the patient
26   broker is providing hourly counseling, consulting or other
27   services to the substance abuse treatment facility, when in fact

28

5

1  the only service the patient broker provides is recruiting and
2  referring patients to the facility.

3      16.   Moreover, substance abuse treatment facilities and
4  patient brokers enter into service contracts that require the
5  facilities to pay the broker a monthly flat-fee, but those
6  service contracts conceal the parties' verbal agreement that
7  sets a quota for the number of patients that the patient broker
8  must refer over a particular length of time (e.g., each month)
9  to the substance abuse treatment facility.   Furthermore,
10 substance abuse treatment facilities that unlawfully pay patient
11 brokers kickbacks based on the number of patients the patient
12 brokers recruit will often maintain handwritten ledgers, secret
13 lists or other documents that set forth the names of patient
14 brokers and the amount of payments made to them for the patient
15 referrals.

16     17.   In addition to the above-referenced illegal revenues,
17 substance abuse treatment facilities derive unlawful revenues by
18 referring patients to clinical laboratories for the performance
19 of lab tests, including urine tests designed to detect whether a
20 patient is using drugs.   While substance abuse treatment
21 facilities operating legally can purchase a screening kit
22 cheaply (e.g., for less than $10.00) that tests urine samples
23 and will immediately show whether drugs are in a patient's
24 system, substance abuse treatment facilities engaged in
25 referring patients to clinical laboratories, in exchange for
26 kickbacks, will receive a portion of the several thousands of
27 dollars paid by insurance companies to the clinical laboratories
28 that perform expensive "confirmation" drug tests.

Greiss And His Companies

18.   Filings with the California Secretary of State reflect most of the following.  Greiss is the Chief Executive Officer, Executive Director, operator and an owner of South Coast Counseling, Inc., which is a substance abuse treatment facility located in Costa Mesa, California.  In addition, Greiss is the Chief Executive Officer, Chief Financial Officer, a director, operator and an owner of Elite Care, Inc., which is also a substance abuse treatment facility located in Costa Mesa, California.  Also, Greiss is a member or manager of Healthcare Consultants of Orange County, LLC, which is a limited liability corporation that shares the same address as Greiss' residence.

19.   As part of operating South Coast Counseling, Inc. and Elite Care, Inc., Greiss was involved in marketing efforts to obtain patients for the substance abuse treatment facilities, negotiating and presenting claims to insurance companies for services performed by the facilities and, as more fully described below, paying kickbacks to patient brokers in exchange for patient referrals, and receiving kickbacks from clinical laboratories in exchange for referring facility patients to those laboratories for the laboratories to perform urine and other tests.

Patient Given Drugs By Patient Recruiter Prior To Patient's Admission Into South Coast Counseling, Inc.'s Detox Program

20.   In January 2017, an individual ("Patient 1") reported the following to the Costa Mesa Police Department.  Patient 1 had been in South Coast Counseling, Inc.'s drug rehabilitation program in 2016 and had returned in January 2017.  Patient 1 had

1 | been picked up by an individual ("Recruiter 1") at Los Angeles
2 | International Airport on January 3, 2017 and then transported to
3 | the Lake Forrest office of a female insurance person ("Recruiter
4 | 2"), who told Patient 1 that in order to be admitted to the
5 | South Coast Counseling, Inc. program, Patient 1 had to undergo
6 | Detox for a few days.

7 | 21. After completing paperwork with Recruiter 2, Recruiter
8 | 1 drove Patient 1 to a park in Santa Ana, California, told
9 | Patient 1 that Patient 1 needed to be under the influence of
10 | drugs in order to be admitted to the South Coast Counseling,
11 | Inc. Detox Center, gave Patient 1 Xanax and injected Patient 1
12 | in the neck with methamphetamine. Recruiter 1 also told Patient
13 | 1 that Recruiter 1 had done the same thing to other individuals
14 | on different occasions in order for those individuals to be
15 | admitted into the program. A South Coast Counseling, Inc.
16 | employee came to the park, picked Patient 1 up, took Patient 1
17 | to the South Coast Counseling, Inc. Detox Center, and Patient 1
18 | remained in the Center for seven days before being transferred
19 | to South Coast Counseling, Inc.'s rehabilitation center.

20 | Greiss Admits Paying Patient Brokers/Marketers For Patient
   | Referrals And Instructing Patient Brokers/Marketers Not To
21 | Submit Invoices For Those Payments Because Written Invoices
   | Would Create A Paper Trail Of Those Payments

22 |

23 | 22. In October 2018, a law enforcement confidential source
   | ("CHS") was tasked by law enforcement officers to conduct
24 | recorded conversations with Greiss, and in doing so the CHS
25 | posed as an individual who had owned and operated substance
26 | abuse treatment facilities and was interested in purchasing
27 | additional facilities. During the recorded conversations, as
28 |

8

set forth in more detail below, Greiss stated that he paid patient brokers on a per-patient basis for patients the patient brokers referred to Greiss' substance abuse treatment facilities.

23. During an October 24, 2018 telephone conversation, Greiss told CHS that (i) Greiss purchased patients from patient brokers; (ii) Greiss kept track of patient referral payments, which referral patients accounted for fifty percent of Greiss' facilities' admissions, on a secret spreadsheet; and (iii) Greiss used one patient marketer who was "super ethical" but could only deliver one or two patients a month, so Greiss paid other patient marketers per patient $500.00 or more per day (and up to a total of $9,000.00) for each day the patient stayed at Greiss' treatment facility.

24. Greiss met with the CHS on November 6, 2018, and during the meeting Greiss (i) showed CHS the secret spreadsheet on Greiss' laptop computer and explained that the spreadsheet reflected, among other things, the monies South Coast Counseling, Inc. paid (at Greiss' direction) to patient marketers for particular patients; (ii) stated that Greiss paid patient marketers $500.00 per day for each patient entering Greiss' facility for Detox treatment and a lesser amount for each patient entering the facility for other treatments (i.e., at 75% or 50% for residential or outpatient care); and (iii) stated that his partners in the substance abuse treatment facilities were "skittish" about Greiss' activities but Greiss nevertheless "ha[d] to keep the beds full," and further stated that "you can't bargain" with the patient marketers on the price

1 | Greiss paid to them for patients because "this is the one area
2 | where we gotta put the money if you want to get the clients
3 | in[.]"

4 |     25. Legitimate businesses generally maintain invoices for
5 | payments those businesses make to third parties so that the
6 | businesses can, among other things, have documents reflecting
7 | those payments available if the businesses are audited.
8 | However, during the November 6, 2018 meeting, Greiss stated that
9 | he "wouldn't accept invoices" from patient marketers, and that
10 | the patient marketer transactions were handled orally with "just
11 | a phone call" so that "there's no paper trail" that would allow
12 | third parties (such as law enforcement) to obtain documents
13 | reflecting Greiss' payments to patient marketers for patients.

14 |     26. As noted above, legitimate substance abuse treatment
15 | facilities, which refuse to pay patient brokers for referring
16 | patients, are often forced to discontinue operations due to a
17 | lack of patients, and during the October 24, 2018 telephone
18 | conversation, Greiss told CHS that referral patients admitted as
19 | a result of the kickback payments accounted for fifty percent of
20 | Greiss' facilities' admissions. Accordingly, absent and but for
21 | the kickback scheme, Greiss' substance abuse treatment
22 | facilities could not have continued to conduct their business
23 | operations and generated the defendant currency or any other
24 | monies as a result of those operations.

25 | / / /
26 | / / /
27 | / / /
28 | / / /

**Greiss Admits Receiving Laboratory Referral Kickback Fees And Paying His Partners Their Share Of Those Kickbacks In Cash Because One Partner Was Concerned About The Legality Of The Laboratory Payments**

27.  As reflected above, substance abuse treatment facilities also derive illegal income by receiving kickbacks from clinical laboratories for the substance abuse treatment facilities' referral of urine and other lab tests designed to determine whether a facility patient has drugs in the patient's system.  The kickback can take the form of the substance abuse treatment facility receiving a percentage of the insurance payments paid by the insurance company to the laboratory.

28.  During a November 14, 2018 meeting with the CHS, Greiss made statements concerning his receipt of kickback payments from laboratories, concealing those payments by having them wired from the laboratories to Greiss' LLC, and withdrawing those funds so that he could pay a portion of those kickback payments in cash to Greiss' partners.  Greiss stated during the meeting that (i) Greiss received payments from laboratories (which payments were typically wired); (ii) Greiss would receive payments in amounts that constituted a percentage of the insurance billings for the laboratory tests; (iii) Greiss received between $35,000.00 and $50,000.00 per month in one year from laboratories; and (iv) Greiss did not have the laboratories pay him directly but instead had the laboratories pay the monies to Greiss' LLC Healthcare Consultants of Orange County, LLC (and whose address was the same as Griess' residence address).

29.  In addition, Greiss also stated during the November 14, 2018 meeting that (i) Greiss would take the payments from

11

1  the laboratories, determine what amount of each payment was
2  owned to Greiss' partners and then pay his partners in cash in
3  one hundred dollar bills for their share; and (ii) Greiss would
4  pay his partners in cash because one of his partners did not
5  want to have payments made directly to that partner because the
6  partner feared that he would lose his medical license if
7  authorities discovered that the partner had received monies from
8  the laboratories and cash payments would permit the partner to
9  claim deniability regarding the source of the cash.
10  Sham Contracts To Conceal Kickback Scheme

11      30.  As mentioned above, substance abuse treatment
12  facilities and patient brokers enter into sham contracts that
13  require the substance abuse treatment facility to make monthly
14  payments to the patient marketer, ostensibly for items such as
15  hourly counseling, consulting or other services performed by the
16  patient marketer, when in fact the payments are being made for
17  the referral of patients and obligate the patient marketer to
18  refer a certain number of patients (i.e., a quota) to the
19  substance abuse treatment facility over a particular period.
20  Greiss entered into a sham contract of this type, as explained
21  further below.

22      31.  Greiss, on behalf of South Coast Counseling, Inc., in
23  or around November or December 2018 entered into a Marketing
24  Services Agreement with SeKe, Inc., which contract provided that
25  it had an effective date of October 1, 2018, required monthly
26  payments of $30,000.00 from South Coast Counseling, Inc. to
27  SeKe, Inc., and included a false provision that prohibited these
28  payments from being based on the volume or value of any patient

referrals provided by SeKe, Inc.  On or about January 2, January 15, February 1, February 15, March 1 and March 15, 2019, Greiss transferred approximately $15,000.00 (for a total of $120,000) in kickback payments from a South Coast Counseling, Inc. account to SeKe, Inc. to induce referrals of patients to South Coast Counseling, Inc. and Elite Care, Inc.

32.   During a March 11, 2019 telephone conversation between Greiss and a patient broker who worked for SeKe, Inc. ("Co-conspirator 1") who, unbeknownst to Greiss was then cooperating with law enforcement, Greiss discussed with Co-conspirator 1 the monetary value of approximately 19 individuals referred to South Coast Counseling, Inc. and Elite Care, Inc. by SeKe, Inc. - - which values were based on the kinds of reimbursable drug treatment the individuals were eligible for and received - - and credited those values against the payments previously made to SeKe, Inc. under the Marketing Services Agreement.  In addition, during an April 3, 2019 telephone conversation, Greiss told Co-conspirator 1 that Greiss "was hungry for admissions," that he (Greiss) was low on Detox-eligible patients, and that he (Greiss) would "rather get admissions" than be paid back the money that Greiss had previously transferred to SeKe, Inc. for patient referrals.

33.   South Coast Counseling, Inc. and Elite Care, Inc. billed and subsequently were reimbursed by insurance companies for drug treatment given to admitted patients that SeKe, Inc. had referred in exchange for the payment of kickbacks by Greiss. Specifically, South Coast Counseling, Inc. and Elite Care, Inc. billed approximately $1,574,780.00 to insurance companies

pertaining to the SeKe, Inc. referrals, and were collectively paid approximately $357,762.00.

Officers Execute The Federal Search Warrant At Greiss' Residence And Seize The Defendant Currency

34. On or about July 26, 2019, law enforcement officers executed a federal search warrant at Greiss' Costa Mesa, California residence. Officers found the defendant currency during the search, which funds were loose and in envelopes. Persons engaged in illegal conduct often maintain currency at their residences, in order to conceal their illegal activity and the funds from law enforcement.

FIRST CLAIM FOR RELIEF

35. Plaintiff incorporates the allegations of paragraphs 1-34 above as though fully set forth herein.

36. Based on the above, plaintiff United States of America alleges that the defendant currency constitutes or is derived from proceeds traceable to, or a conspiracy to commit violations of 18 U.S.C. §§ 220 (illegal remunerations for referrals), 1343 (wire fraud), 1347 (health care fraud) and 1952 (interstate travel in aid of bribery in violation of Cal. Ins. Code § 750), each of which is a specified unlawful activity as defined in 18 U.S.C. §§ 1956(c)(7)(A), 1956(c)(7)(F) and 1961(1)(B). The defendant currency is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C). In addition, to the extent that the defendant currency is not the actual monies directly traceable to the illegal activity identified herein, plaintiff United States of America alleges that the defendant currency is identical property found in the same account or place as the

14

property involved in the specified offense, rendering the
defendant currency subject to forfeiture pursuant to 18 U.S.C.
§ 984.

### SECOND CLAIM FOR RELIEF

37. Plaintiff incorporates the allegations of paragraphs
1-34 above as though fully set forth herein.

38. Based on the above, plaintiff alleges that the
defendants constitute property involved in multiple transactions
or attempted transactions in violation of 18 U.S.C.
§ 1956(a)(1)(A)(i) or (a)(1)(B)(i), or property traceable to
such property, with the specified unlawful activity being a
violation of 18 U.S.C. §§ 220, 1343, 1347 and/or 1952. The
defendant currency is therefore subject to forfeiture pursuant
to 18 U.S.C. § 981(a)(1)(A). In addition, to the extent that
the defendant currency is not the actual monies directly
traceable to the illegal activity identified herein, plaintiff
United States of America alleges that the defendant currency is
identical property found in the same account or place as the
property involved in the specified offense, rendering the
defendant currency subject to forfeiture pursuant to 18 U.S.C.
§ 984.

### THIRD CLAIM FOR RELIEF

39. Plaintiff incorporates the allegations of paragraphs
1-34 above as though fully set forth herein.

40. Based on the above, plaintiff alleges that the
defendant currency constitutes property involved in multiple
transactions or attempted transactions in violation of 18 U.S.C.
§ 1957(a), or property traceable to such property, with the

1   specified unlawful activity being a violation of 18 U.S.C.
2   §§ 220, 1343, 1347 and/or 1952.  The defendant currency is
3   therefore subject to forfeiture pursuant to 18 U.S.C.
4   § 981(a)(1)(A).  In addition, to the extent that the defendant
5   currency is not the actual monies directly traceable to the
6   illegal activity identified herein, plaintiff United States of
7   America alleges that the defendant currency is identical
8   property found in the same account or place as the property
9   involved in the specified offense, rendering the defendant
10  currency subject to forfeiture pursuant to 18 U.S.C. § 984.
11      WHEREFORE, plaintiff United States of America prays:
12      (a)  that due process issue to enforce the forfeiture of
13  the defendant currency;
14      (b)  that due notice be given to all interested parties to
15  appear and show cause why forfeiture should not be decreed;
16      (c)  that this Court decree forfeiture of the defendant
17  currency to the United States of America for disposition
18  according to law; and
19  / / /
20  / / /
21  / / /
22  / / /
23  / / /
24  / / /
25  / / /
26  / / /
27  / / /
28  / / /

1       (d)   for such other and further relief as this Court may

2   deem just and proper, together with the costs and disbursements

3   of this action.

4   Dated: October 14, 2020       NICOLA T. HANNA
                                           United States Attorney

5                                              BRANDON D. FOX
                                         Assistant United States Attorney

6                                            Chief, Criminal Division
                                         STEVEN R. WELK

7                                            Assistant United States Attorney
                                         Chief, Asset Forfeiture Section

8

9                                            VICTOR A. RODGERS

10                                           Assistant United States Attorney
                                         Asset Forfeiture Section

11

12                                           Attorneys for Plaintiff
                                         UNITED STATES OF AMERICA

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

VERIFICATION

I, Darrell K. Twedt, hereby declare that:

1.    I am a Special Agent with the Federal Bureau of Investigation.

2.    I have read the above Complaint for Forfeiture and know the contents thereof.

3.    The information contained in the Complaint is either known to me personally, was furnished to me by official government sources, or was obtained pursuant to subpoena.   I am informed and believe that the allegations set out in the Complaint are true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on *October 14*, 2020 at *Orange*, California.

_____
Darrell K. Twedt